1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

GUTRIDE SAFIER LLP

Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com
Todd Kennedy (State Bar No. 250267)
  todd@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Jasen Silver; Jill Lienhard; Patricia Tysinger; Victoria Waters; and Alaina Jones, on behalf of themselves and those similarly situated, | Case No. _____ |
| Plaintiffs, | Class Action Complaint |
| v. | Jury Trial Demanded |
| Stripe, Inc., | |
| Defendant. | |

Plaintiffs Jasen Silver, Jill Lienhard, Patricia Tysinger, Victoria Waters, and Alaina Jones bring this action on behalf of themselves and all others similarly situated against Stripe, Inc. Plaintiffs' allegations against Stripe are based upon information and belief and upon investigation of Plaintiffs' counsel, except for allegations specifically pertaining to Plaintiffs, which are based upon Plaintiffs' personal knowledge.

### Introduction

1.     Stripe is one of the largest online payment processors in the world, with millions of corporate customers of all sizes. Many of Stripe's customers are merchants who operate popular websites and mobile applications, such as Instacart.

2.     Stripe achieved commercial success by creating software code designed to enable merchants to easily integrate Stripe's payment platform into their applications. To that end, Stripe provides comprehensive documentation to its customers, describing how to integrate payment forms into their websites and applications using the Stripe code.

3.     One of Stripe's most popular offerings is Stripe Elements. When a merchant successfully integrates the Stripe software code into a website or mobile application, consumers who desire to pay for a product or service are presented with Stripe Elements payment forms created by Stripe and rendered by the user's browser or mobile application executing the Stripe code. The payment forms require the consumer to provide a variety of sensitive information, such as name and address, telephone number, email address, and, of course, complete credit card information.

4.     Although consumers using merchants' websites and mobile

applications reasonably expect that they are communicating directly with the merchant, Stripe's software code is designed to enable Stripe's computer network to intercept those communications and redirect them to Stripe's computer network. Stripe, however, designed Elements to omit all Stripe branding from its payment forms. Accordingly, the consumer has no idea that Stripe is involved in the transaction in any way, let alone that Stripe will be obtaining, storing, and evaluating the consumer's sensitive communications and information.

5.     But Stripe goes far beyond collecting consumers' sensitive payment information. Stripe also collects and indefinitely stores sensitive information such as:

- the consumer's IP address;
- the geolocation of the consumer and his or her device;
- the name of the consumer's bank or card issuer;
- whether or not the consumer had sufficient funds for the transaction;
- other processing codes returned by the consumer's bank, such "do not honor" codes or those relating to stolen cards; and
- whether the consumer later disputes the charge.

6.     The Stripe code also surreptitiously installs tracking cookies on consumers' computers and mobile devices, so that Stripe can track their purchasing behavior across its vast merchant network.

7.     Stripe does not use consumers' private information simply for the purposes of processing the payments in question. Instead, Stripe indefinitely stores the information, correlates all payments from the consumer made across its entire platform, and then—without informing the consumer—provides much of it to its other merchants. For example, once a consumer has submitted a payment

1   using Instacart, any of Stripe's millions of other merchant customers will then be

2   able to access the consumer's private information pertaining to that payment, as

3   well as any other payment that Stripe processed for that consumer.

4       8.    For example, Stripe creates a "Risk Insights" profile for each

5   consumer, and provides it to **any** of its customers who deal with that consumer:



**Figure 1: Stripe Radar Dashboard (consumer identifying information blurred)**

9.     In addition to providing this private information to its merchant customers, Stripe also uses it to assess the risk of financial transactions the consumer attempts to make in the future. Specifically, Stripe uses the information to assign a Risk Score to each of the consumer's transactions, so that those transactions can be accepted or rejected by Stripe or its merchants.

10.     At no time does Stripe inform consumers who use its Elements payment forms: (i) that Stripe will intercept communications that consumers believe are being sent exclusively to merchants; (ii) that its software code is causing their devices to connect to Stripe's computer servers; (iii) that Stripe is placing tracking cookies on consumers' computers; (iv) that its software code is rendering the payment forms that are displayed to consumers; (v) that the sensitive information in the payment forms will be sent to Stripe; (vi) that sensitive information not expressly inputted by the consumer—such as IP address, operating system, and geolocation data—will also be collected from the consumer by Stripe; (vii) that Stripe will indefinitely store that sensitive information; (viii) that Stripe will use consumers' information to assign Risk Scores to consumers, which could subsequently be communicated to other merchants and used to deny consumers' future payment attempts; (ix) that Stripe will track consumers' behavior across millions of website and mobile applications; and (x) that Stripe will make consumers' sensitive information available to any of its millions of customers who will accept payment—or who have already accepted payment—from those consumers.

## Parties

11.     Plaintiff Jasen Silver is, and was at all relevant times, an individual and

resident of California. Mr. Silver currently resides in San Jose, California.

12.    Plaintiff Jill Lienhard is, and was at all relevant times, an individual and resident of California. Ms. Lienhard currently resides in Arroyo Grande, California.

13.    Plaintiff Patricia Tysinger is, and was at all relevant times, an individual and resident of Florida. Ms. Tysinger currently resides in Lehigh Acres, Florida.

14.    Plaintiff Victoria Waters is, and was at all relevant times, an individual and resident of Washington. Ms. Waters currently resides in Seattle, Washington.

15.    Plaintiff Alaina Jones is, and was at all relevant times, an individual and resident of Utah. Ms. Jones currently resides in Orem, Utah.

16.    Defendant Stripe, Inc. is a Delaware limited liability company with its principal place of business in San Francisco, California.

## Jurisdiction and Venue

17.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. Section 1332(d)(2)(A) because: (i) there are 100 or more class members, and (ii) there is an aggregate amount in controversy exceeding $5,000,000, exclusive of interest and costs.

18.    This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. Section 1367.

19.    The injuries, damages and/or harm upon which this action is based occurred or arose out of activities engaged in by Stripe within, affecting, and emanating from the State of California. Stripe regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California.

Stripe has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

20.    Venue is proper in this District pursuant to 28 U.S.C. Section 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the state of California, including within this District.

21.    Plaintiffs accordingly allege that jurisdiction and venue are proper in this Court.

### Substantive Allegations

**A.    Stripe Surreptitiously Intercepts Consumers' Communications and Collects their Private Information When They Make Online Payments to Merchants.**

22.    Stripe Elements is Stripe's premier payment processing offering. The product is designed to enable merchants to avoid the technical difficulties associated with developing and deploying their own payment forms into their websites and mobile applications. Merchants can simply integrate the Stripe software code into their websites and applications to enable Stripe to display payment forms to consumers. Stripe handles the collection and validation of the consumer's payment information, as well as processing the payment.

23.    To integrate Stripe Elements into its website, a merchant must include a link to "Stripe.js"—a software module developed by Stripe and hosted at Stripe's computer network—in the code of the merchant's website. This link, which is invisible to the consumer, causes the consumer's browser to load and execute the Stripe.js code. The Stripe.js code includes code for the execution and customization of Stripe Elements, as well as code that, as explained in more detail below, enables Stripe to intercept communications that consumers reasonably believe will be sent directly to the merchant. To integrate payment forms into

mobile device applications, merchants use the Stripe Development Kits ("SDKs"), which includes the code that enables Stripe to intercept communications that consumers reasonably believe will be sent directly to the merchant.

24.    Stripe Elements enables merchants to customize certain aspects of the payment forms, to match the look and feel of their websites and applications. Stripe's documentation states: "Elements are completely customizable. You can style Elements to match the look and feel of your site, providing a seamless checkout experience for your customers." (https://stripe.com/docs/stripe-js)

25.    This customizability enables Stripe to present payment forms to consumers in such a way that consumers have no way to discern that Stripe is involved in the transaction. To the consumer, the Stripe Elements payment forms appear to be generated by the merchant itself.

26.    For example, consumers who order groceries on Instacart's website are presented with the following Stripe Elements payment form:



**Figure 2: Instacart Checkout Page**

27.     In the above figure, the input elements corresponding to "Card Number," "Expiration," "CVC", "Billing Address", and "Zip code" are Stripe Elements, generated by Stripe's software code and rendered by the consumer's browser. To the user, however, it appears that these input elements are generated and provided by Instacart. Although it could easily do so, Stripe never causes its name or logo—or any other disclosure regarding its involvement—to be displayed to the consumer.

28.   Only a person with technical knowledge and special software tools could determine that the payment forms are generated by Stripe. As shown by the following screenshot from such a tool, the Instacart page above required the consumer's browser to load over two dozen separate files from Stripe's computer network:



**Figure 3: Assets loaded from Stripe during rendering of Instacart checkout page**

29.    When the consumer's computer or mobile application loads the merchant's payment page, the device also loads and executes the code contained in Stripe.js or, for mobile applications, the iOS or Android SDKs. Among other things, this causes a tracking cookie to be installed on the consumer's device. For example, Stripe.js causes a tracking cookie to be installed which contains a field entitled "private_machine_identifier," which uniquely identifies the consumer's device, so that Stripe can track the consumer's behavior across its vast merchant network.

30.    When a consumer completes and submits the payment form, it appears to the consumer that the information in the payment form will be sent directly to the merchant. However, the software code of Stripe.js, the iOS and Android SDKs, and Stripe Elements ensures that consumers' communications—including the private information in the payment form—are intercepted and rerouted to Stripe's computer servers at m.stripe.com. As Stripe says in its documentation, its software code "tokenizes the sensitive information within an Element without ever having it touch your [i.e., the merchant's] server." (https://stripe.com/docs/stripe-js).

31.    But submitting the payment form also causes other private information to be sent to Stripe, such as the consumer's browser, device, IP address, and the tracking cookie described above.

**B.    Stripe Discloses and Sells Consumers' Sensitive Information to its Customers, and Uses it to Assess Transaction Risk.**

32.    Because millions of websites and mobile applications use Stripe to process payments, Stripe has amassed an incredible amount of sensitive data regarding consumers. Stripe leverages this data to assess the risk associated with

1    particular consumers and their transactions. Stripe states this clearly on its

2    website:

### Trained with hundreds of billions of data points

Stripe processes payments from 195 countries for every industry, company size, and business model. Even if a card is new to your business, there's an 89% chance it's been seen before on the Stripe network.

**Strength in numbers**

By learning from millions of global businesses processing billions in payments each year, Radar can assign risk scores to every payment and automatically block many high-risk payments.

**Better ML outcomes with Stripe-scale data**

Radar scans every payment using thousands of signals from across the Stripe network to help detect and prevent fraud—even before it hits your business.

**Data from payments**

Radar is fully integrated with the rest of Stripe so our systems can instantly use rich payment information like customer details, shipping and billing addresses, and other properties to improve machine learning performance.

**Data from checkout flows**

Stripe's checkout tools automatically incorporate certain buyer patterns from your website and mobile app to help detect anomalous payments. Radar uses these signals to map a comprehensive customer path that is highly predictive of fraud.

22    (https://stripe.com/radar)

23        33.    Although Stripe does not publish a comprehensive list of what data it

24    collects from consumers to asses risk, it is known that Stripe collects at least the

25    following data:

26

- whether the consumer had ever disputed a previous Stripe charge;

- whether any previous early fraud warnings were associated with the
  consumer;

- the percentage of transactions that were authorized for the consumer over
  time;

- the number of cards that have been used at the consumer's IP address;

- the consumer's device brand and model, browser, and operating system;

- the number of declined cards that the consumer had used with Stripe;

- a record of when the consumer's attempted purchases were declined; and

- the consumer's IP address and internet service provider.

(*See supra*, Fig. 1.)

34.    Stripe distills this information into a "Risk Score" for each consumer and payment. Stripe then applies that Risk Score for future payments, and will block payments with Risk Scores that exceed the default threshold that is set by Stripe. Stripe also enables its more savvy customers to adjust that threshold:

### Risk settings

Tune Radar's fraud blocking for your business with Radar for Fraud Teams

Stripe Radar gives each charge a numerical risk score between 0 and 99, with 0 being the least risky and 99 the riskiest. By default, the *blocking threshold* is set to 75 - in other words, Radar will block charges with a score of 75 or greater.

Depending on your business needs you may want to customize these default thresholds. For example, your business may have low fraud rates and costs. In this case, you may want to increase the default score at which Radar blocks so that you can allow more payments overall. Alternatively, you may have a goal to decrease fraud further for your business, in which case you might want to decrease the risk score at which Radar blocks by default so that you can more aggressively block fraudulent payments.

(https://stripe.com/docs/radar/risk-settings).

35.    In addition to using this sensitive consumer information to assess risk and predict fraud, Stripe makes that information available to its merchant

customers. In fact, the sensitive data shown in Figure 1 above (other than the transaction-specific data) could be accessed by *any* Stripe customer who processed a payment for that particular consumer.

### C.    Stripe Does Not Inform Consumers About Its Activities.

36.    At no time does Stripe inform consumers of *any* of its activities with respect to Stripe Elements. Specifically, it does not inform consumers (i) that Stripe will intercept communications that consumers believe are being sent exclusively to merchants; (ii) that its software code is causing their devices to connect to Stripe's computer servers; (iii) that Stripe is placing tracking cookies on consumers' computers; (iv) that its software code is rendering the payment forms that are displayed to consumers; (v) that the sensitive information in the payment forms will be sent to Stripe; (vi) that sensitive information not expressly inputted by the consumer—such as IP address, operating system, and geolocation data—will also be collected from the consumer by Stripe; (vii) that Stripe will indefinitely store that sensitive information; (viii) that Stripe will use consumers' information to assign Risk Scores to consumers, which could subsequently be communicated to other merchants and used to deny consumers' future payment attempts; (ix) that Stripe will track consumers' behavior across millions of website and mobile applications; and (x) that Stripe will make consumers' sensitive information available to any of its millions of customers who will accept payment—or who have already accepted payment—from those consumers.

37.    Because it is Stripe's software code that is responsible for rendering the payment forms on consumers' browsers, Stripe could have easily chosen to give the consumer some type of notice of its deep involvement in the transactions at issue. For example, Stripe could have included its logo on the forms, or a link to

its website, or privacy policy, or terms of use, or could have even simply caused the word "Stripe" to appear somewhere on or adjacent to the form. Stripe, however, deliberately chose to hide its involvement from consumers. Stripe did so to increase its profits, because (i) it understands that consumers value the privacy of their communications and do not wish those communications to be intercepted; (ii) it understands that consumers do not wish for their activities to be tracked across a vast network of third party merchants; and (iii) it wants to maximize the ability of its merchant customers to "white-label" payment forms, to make it appear to consumers that the merchants have the sophistication to handle payments themselves and without extensive third party involvement.

38.    Stripe does not review its customers' websites or mobile applications to determine whether its customers have disclosed to consumers any of Stripe's activities with respect to their personal information.

39.    The vast majority of Stripe's merchants do not inform consumers that Stripe is involved in processing payments, let alone that Stripe will intercept their communications, re-route their private information to Stripe's computer network, install tracking cookies on their devices, assign Risk Scores to their transactions, and make their sensitive information available to other merchants. Indeed, even Instacart—one of Stripe's flagship customers—does not make any such disclosure, even in its Terms of Service or Privacy Policy.

40.    Consumers using Stripe Elements are not required to agree with Stripe's Terms of Use or Privacy Policy. Indeed, at no time does Stripe even display its Terms of Use or Privacy Policy to them.

**D.    Plaintiffs' Experiences**

      **1.    Jasen Silver**

41.    Plaintiff Jasen Silver has purchased groceries using Instacart a number of times during the COVID-19 pandemic. Most recently, he purchased groceries from Instacart on or about November 10, 2020.

42.    Mr. Silver has used both his laptop computer and his smart phone to purchase the groceries. To do so, he used the computer's or smart phone's browser to establish a secure, encrypted connection to Instacart at https://www.instacart.com.

43.    After adding groceries to his virtual shopping cart, Mr. Silver would start the online checkout process, at which point he was presented with a checkout screen substantially similar to the screen shown at Figure 2, *supra*.

44.    Mr. Silver believed that all aspects of the checkout screen were being generated by Instacart, and sent over his browser's encrypted connection with Instacart.

45.    Mr. Silver was required to provide his private information in order to complete the checkout process, including information such as his full name, delivery address, billing address phone number, and credit card number, expiration date, and CVV code. Mr. Silver provided this information, and then clicked on the "Place order" button to submit it. When he did so, Mr. Silver believed that this information would be sent directly to Instacart, through the secure, encrypted connection that his computer browser had established with Instacart.

46.    Although Mr. Silver was not aware of it, the Instacart checkout page he visited contained a link to the Stripe.js and Stripe Elements software code, which caused his computer browser to load and execute the code. Although it was

not disclosed to Mr. Silver, this code (i) enabled Stripe to intercept communications—including those with his private information—that he reasonably believed would be sent exclusively to Instacart; (ii) enabled Stripe to install and/or confirm the installation of a tracking cookie, containing a unique tracking code, on his computer; (iii) caused his computer browser to establish a connection with Stripe's computer network; and (iv) generated the payment form input elements requiring Mr. Silver to enter his private information. When Mr. Silver submitted the form containing his private information to complete the checkout process, his private information was sent to Stripe's computer network, where it was stored, analyzed, and processed. Mr. Silver was never informed of any of these facts. Indeed, Mr. Silver did not know that Stripe was involved in the transaction at all, because it was never disclosed to him.

47.    Stripe has used Mr. Silver's private information to assign a Risk Score to his subsequent transactions with Instacart and/or with any other merchant that uses the Stripe network. Stripe has also offered to make and/or actually made Mr. Silver's private information available to any of its merchant customers who process payments by Mr. Silver.

48.    Had Mr. Silver known that Stripe would install a tracking cookie on his computer browser, for the purpose of tracking him across potentially hundreds of thousands, if not millions, of websites, Mr. Silver would not have purchased groceries using Instacart.

49.    Had Mr. Silver known that Stripe would collect, store, and analyze his private information to increase its own profits, Mr. Silver would not have purchased groceries using Instacart.

50.    Had Mr. Silver known that Stripe would offer to make his private information to any of its millions of merchant customers with whom he may engage in a subsequent financial transaction, Mr. Silver would not have purchased groceries using Instacart.

### 2.    Jill Lienhard

51.    Plaintiff Jill Lienhard has purchased groceries using Instacart on a few occasions, including most recently on September 17, 2020.

52.    Ms. Lienhard has used both her desktop computer and her smart phone to purchase the groceries. To do so, she used the computer's or smart phone's browser to establish a secure, encrypted connection to Instacart at https://www.instacart.com.

53.    After adding groceries to her virtual shopping cart, Ms. Lienhard would start the online checkout process, at which point she was presented with a checkout screen substantially similar to the screen shown at Figure 2, supra.

54.    Ms. Lienhard believed that all aspects of the checkout screen were being generated by Instacart, and sent over her browser's encrypted connection with Instacart.

55.    Ms. Lienhard was required to provide her private information in order to complete the checkout process, including information such as her full name, delivery address, billing address phone number, and credit card number, expiration date, and CVV code. Ms. Lienhard provided this information, and then clicked on the "Place order" button to submit it. When she did so, Ms. Lienhard believed that this information would be sent directly to Instacart, through the secure, encrypted connection that her computer browser had established with Instacart.

56.   Although Ms. Lienhard was not aware of it, the Instacart checkout page she visited contained a link to the Stripe.js and Stripe Elements software code, which caused her computer browser to load and execute the code. Although it was not disclosed to Ms. Lienhard, this code (i) enabled Stripe to intercept communications—including those with her private information—that she reasonably believed would be sent exclusively to Instacart; (ii) enabled Stripe to install and/or confirm the installation of a tracking cookie, containing a unique tracking code, on her computer; (iii) caused her computer browser to establish a connection with Stripe's computer network; and (iv) generated the payment form input elements requiring Ms. Lienhard to enter her private information. When Ms. Lienhard submitted the form containing her private information to complete the checkout process, her private information was sent to Stripe's computer network, where it was stored, analyzed, and processed. Ms. Lienhard was never informed of any of these facts. Indeed, Ms. Lienhard did not know that Stripe was involved in the transaction at all, because it was never disclosed to her.

57.   Stripe has used Ms. Lienhard's private information to assign a Risk Score to her subsequent transactions with Instacart and/or with any other merchant that uses the Stripe network. Stripe has also offered to make and/or actually made Ms. Lienhard's private information available to any of its merchant customers who process payments by Ms. Lienhard.

58.   Had Ms. Lienhard known that Stripe would install a tracking cookie on her computer browser, for the purpose of tracking her across potentially hundreds of thousands, if not millions, of websites, Ms. Lienhard would not have purchased groceries using Instacart.

59.    Had Ms. Lienhard known that Stripe would collect, store, and analyze her private information to increase its own profits, Ms. Lienhard would not have purchased groceries using Instacart.

60.    Had Ms. Lienhard known that Stripe would offer to make her private information to any of its millions of merchant customers with whom she may engage in a subsequent financial transaction, Ms. Lienhard would not have purchased groceries using Instacart.

### 3.    Patricia Tysinger

61.    Plaintiff Patricia Tysinger has purchased groceries using Instacart on dozens of occasions, including most recently on or about October 30, 2020.

62.    Ms. Tysinger has used both her laptop computer and her the Instacart mobile application on her smart phone to purchase the groceries. When she used her laptop computer, she used the computer's browser to establish a secure, encrypted connection to Instacart at https://www.instacart.com. When she used the Instacart mobile application, it would establish a secure, encrypted connection to Instacart at instacart.com.

63.    After adding groceries to her virtual shopping cart, Ms. Tysinger would start the online checkout process, at which point she was presented with a checkout screen substantially similar to the screen shown at Figure 2, supra.

64.    Ms. Tysinger believed that all aspects of the checkout screen were being generated by Instacart, and sent over her browser's encrypted connection with Instacart.

65.    Ms. Tysinger was required to provide her private information in order to complete the checkout process, including information such as her full name, delivery address, billing address phone number, and credit card number,

expiration date, and CVV code. Ms. Tysinger provided this information, and then clicked on or pressed the "Place order" button to submit it. When she did so, Ms. Tysinger believed that this information would be sent directly to Instacart, through the secure, encrypted connection that her device had established with Instacart.

66.     Although Ms. Tysinger was not aware of it, where she used her browser to access Instacart, the Instacart checkout page contained a link to the Stripe.js and Stripe Elements software code, which caused her device to load and execute the code. Likewise, when she used the Instacart mobile application, it utilized the Stripe SDK code, which caused her device to load and execute that code. Although it was not disclosed to Ms. Tysinger, the Stripe.js, Elements, and SDK code (i) enabled Stripe to intercept communications—including those with her private information—that she reasonably believed would be sent exclusively to Instacart; (ii) enabled Stripe to install and/or confirm the installation of a tracking cookie, containing a unique tracking code, on her device; (iii) caused her device to establish a connection with Stripe's computer network; and (iv) generated the payment form input elements requiring Ms. Tysinger to enter her private information. When Ms. Tysinger submitted the form containing her private information to complete the checkout process, her private information was sent to Stripe's computer network, where it was stored, analyzed, and processed. Ms. Tysinger was never informed of any of these facts. Indeed, Ms. Tysinger did not know that Stripe was involved in the transaction at all, because it was never disclosed to her.

67.     Stripe has used Ms. Tysinger's private information to assign a Risk Score to her subsequent transactions with Instacart and/or with any other

merchant that uses the Stripe network. Stripe has also offered to make and/or actually made Ms. Tysinger's private information available to any of its merchant customers who process payments by Ms. Tysinger.

68.  Had Ms. Tysinger known that Stripe would install a tracking cookie on her device, for the purpose of tracking her across potentially hundreds of thousands, if not millions, of websites, Ms. Tysinger would not have purchased groceries using Instacart.

69.  Had Ms. Tysinger known that Stripe would collect, store, and analyze her private information to increase its own profits, Ms. Tysinger would not have purchased groceries using Instacart.

70.  Had Ms. Tysinger known that Stripe would offer to make her private information to any of its millions of merchant customers with whom she may engage in a subsequent financial transaction, Ms. Tysinger would not have purchased groceries using Instacart.

### 4.    Victoria Waters

71.  Plaintiff Victoria Waters has purchased groceries using the Android Instacart mobile application on several occasions, including most recently on or about May 14, 2020.

72.  Ms. Waters has used the Instacart application on both her mobile phone and tablet. When she did so, she understood that it would establish a secure, encrypted connection to Instacart at instacart.com.

73.  After adding groceries to her virtual shopping cart, Ms. Waters would start the online checkout process, at which point she was presented with a checkout screen substantially similar to the screen shown at Figure 2, supra.

74.    Ms. Waters believed that all aspects of the checkout screen were being generated by Instacart, and sent over her device's encrypted connection with Instacart.

75.    Ms. Waters was required to provide her private information in order to complete the checkout process, including information such as her full name, delivery address, billing address phone number, and credit card number, expiration date, and CVV code. Ms. Waters provided this information, and then clicked on or pressed the "Place order" button to submit it. When she did so, Ms. Waters believed that this information would be sent directly to Instacart, through the secure, encrypted connection that her device had established with Instacart.

76.    Although Ms. Waters was not aware of it, the Instacart mobile application utilized the Stripe Android SDK code, which caused her device to load and execute the code. Although it was not disclosed to Ms. Waters, this code (i) enabled Stripe to intercept communications—including those with her private information—that she reasonably believed would be sent exclusively to Instacart; (ii) enabled Stripe to install and/or confirm the installation of a tracking cookie, containing a unique tracking code, on her device; (iii) caused her device to establish a connection with Stripe's computer network; and (iv) generated the payment form input elements requiring Ms. Waters to enter her private information. When Ms. Waters submitted the form containing her private information to complete the checkout process, her private information was sent to Stripe's computer network, where it was stored, analyzed, and processed. Ms. Waters was never informed of any of these facts. Indeed, Ms. Waters did not know that Stripe was involved in the transaction at all, because it was never disclosed to her.

77.   Stripe has used Ms. Waters's private information to assign a Risk Score to her subsequent transactions with Instacart and/or with any other merchant that uses the Stripe network. Stripe has also offered to make and/or actually made Ms. Waters's private information available to any of its merchant customers who process payments by Ms. Waters.

78.   Had Ms. Waters known that Stripe would install a tracking cookie on her device, for the purpose of tracking her across potentially hundreds of thousands, if not millions, of websites, Ms. Waters would not have purchased groceries using Instacart.

79.   Had Ms. Waters known that Stripe would collect, store, and analyze her private information to increase its own profits, Ms. Waters would not have purchased groceries using Instacart.

80.   Had Ms. Waters known that Stripe would offer to make her private information to any of its millions of merchant customers with whom she may engage in a subsequent financial transaction, Ms. Waters would not have purchased groceries using Instacart.

### 5.   Alaina Jones

81.   Plaintiff Alaina Jones has purchased groceries using the Instacart iPhone mobile application on several occasions, including most recently on or about November 18, 2020.

82.   Ms. Jones has used the Instacart application on her mobile phone. When she did so, she understood that it would establish a secure, encrypted connection to Instacart at instacart.com.

83.     After adding groceries to her virtual shopping cart, Ms. Jones would start the online checkout process, at which point she was presented with a checkout screen substantially similar to the screen shown at Figure 2, supra.

84.     Ms. Jones believed that all aspects of the checkout screen were being generated by Instacart, and sent over her device's encrypted connection with Instacart.

85.     Ms. Jones was required to provide her private information in order to complete the checkout process, including information such as her full name, delivery address, billing address phone number, and credit card number, expiration date, and CVV code. Ms. Jones provided this information, and then clicked on or pressed the "Place order" button to submit it. When she did so, Ms. Jones believed that this information would be sent directly to Instacart, through the secure, encrypted connection that her device had established with Instacart.

86.     Although Ms. Jones was not aware of it, the Instacart mobile application utilized the Stripe iOS SDK code, which caused her device to load and execute the code. Although it was not disclosed to Ms. Jones, this code (i) enabled Stripe to intercept communications—including those with her private information—that she reasonably believed would be sent exclusively to Instacart; (ii) enabled Stripe to install and/or confirm the installation of a tracking cookie, containing a unique tracking code, on her device; (iii) caused her device to establish a connection with Stripe's computer network; and (iv) generated the payment form input elements requiring Ms. Jones to enter her private information. When Ms. Jones submitted the form containing her private information to complete the checkout process, her private information was sent to Stripe's computer network, where it was stored, analyzed, and processed. Ms. Jones was

never informed of any of these facts. Indeed, Ms. Jones did not know that Stripe was involved in the transaction at all, because it was never disclosed to her.

87.    Stripe has used Ms. Jones's private information to assign a Risk Score to her subsequent transactions with Instacart and/or with any other merchant that uses the Stripe network. Stripe has also offered to make and/or actually made Ms. Jones's private information available to any of its merchant customers who process payments by Ms. Jones.

88.    Had Ms. Jones known that Stripe would install a tracking cookie on her device, for the purpose of tracking her across potentially hundreds of thousands, if not millions, of websites, Ms. Jones would not have purchased groceries using Instacart.

89.    Had Ms. Jones known that Stripe would collect, store, and analyze her private information to increase its own profits, Ms. Jones would not have purchased groceries using Instacart.

90.    Had Ms. Jones known that Stripe would offer to make her private information to any of its millions of merchant customers with whom she may engage in a subsequent financial transaction, Ms. Jones would not have purchased groceries using Instacart.

**Class Allegations**

91.    In addition to their individual claims, Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

92.    Plaintiffs bring this class action lawsuit on behalf of a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, defined as follows:

"The California Class": All natural persons who, between November 19, 2016 and the present, submitted payment information via Stripe Elements or a Stripe Software Development Kit, while located in California.

"The Florida Class": All natural persons who, between November 19, 2018 and the present, submitted payment information via Stripe Elements or a Stripe Software Development Kit, while located in Florida.

"The Washington Class": All natural persons who, between November 19, 2017 and the present, submitted payment information via Stripe Elements or a Stripe Software Development Kit, while located in Washington.

"The Utah Class": All natural persons who, between November 19, 2017 and the present, submitted payment information via Stripe Elements or a Stripe Software Development Kit, while located in Utah.[1]

93.    This action has been brought and may properly be maintained as a class action against Stripe because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

94.    Numerosity: Plaintiffs do not know the exact size of the Classes, but they estimate that each Class is composed of more than 5,000 persons. The persons in each Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

95.    Common Questions Predominate:  This action involves common questions of law and fact to the potential Classes because each class member's claim derives from the same unlawful practices of Stripe. The common questions of law and fact predominate over individual questions, as proof of a common or

[1] As used in this Complaint, the term "California Class" shall specifically include Mr. Silver and Ms. Lienhard; the term "Florida Class" shall specifically include Ms. Tysinger; the term "Washington Class" shall specifically include Ms. Waters; and the term "Utah Class" shall specifically include Ms. Jones. Each class additionally includes those similarly situated.

single set of facts will establish the right of each member of the Classes to recover. The questions of law and fact common to the California Class include, but are not limited to, whether Stripe has violated Sections 631 and 635 of the California Invasion of Privacy Act; whether Stripe invaded the California Class members' privacy rights in violation of the California Constitution; whether Stripe violated California's Unfair Competition Law; and whether the California class members are entitled to actual damages, statutory damages, and/or equitable relief for these violations. The questions of law and fact common to the Florida Class includes, but are not limited to, whether Stripe violated the Florida Security of Communications Act, and whether the class members are entitled to actual and/or statutory damages for those violations. The questions of law and fact common to the Washington Class includes, but are not limited to, whether Stripe violated Section 9.73.030 of the Revised Code of Washington, and whether the class members are entitled to actual and/or statutory damages, and attorneys' fees and costs, for those violations. The questions of law and fact common to the Utah Class includes, but are not limited to, whether Stripe violated the Utah Notice of Intent to Sell Nonpublic Personal Information Act, and whether the class members are entitled to actual and/or statutory damages for those violations.

96.     Typicality: Plaintiffs' claims are typical of the claims of other members of each Class because, among other things, all such claims arise out of the same unlawful course of conduct in which Stripe engaged. Plaintiffs and those similarly situated used Stripe Elements and had their electronic communications intercepted and disclosed to Stripe through the use of Stripe's wiretaps.

97.     Adequacy of Representation: Plaintiffs will fairly and adequately protect the interests of all class members because it is in their best interests to

prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also have no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and those of the classes. By prevailing on their own claims, Plaintiffs will establish Stripe's liability to all class members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

98.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the classes will tend to establish inconsistent standards of conduct for Stripe and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the classes may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

99.    Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

///

**CAUSES OF ACTION**

**First Cause of Action**

**Violation of the California Invasion of Privacy Act,
California Penal Code § 631**

**(On Behalf of Mr. Silver, Ms. Lienhard, and the California Class)**

100.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

101.   The California Invasion of Privacy Act, codified at Cal. Penal Code §§ 630 to 638, includes the following statement of purpose:

> The Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

102.   To establish liability under section 631(a), a plaintiff need only establish that a defendant, "by means of any machine, instrument, contrivance, or in any other manner," did any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*

Uses, or attempts to use, in any manner, or for any purpose,
or to communicate in any way, any information so
obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or
persons to unlawfully do, or permit, or cause to be done
any of the acts or things mentioned above in this section.

(Cal. Penal Code § 631(a).)

103.  Section 631(a) is not limited to phone lines, but also applies to "new

technologies" such as computers, the Internet, and email. *See Matera v. Google

Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new

technologies" and must be construed broadly to effectuate its remedial purpose of

protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D.

Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re

Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020)

(reversing dismissal of CIPA and common law privacy claims based on

Facebook's collection of consumers' Internet browsing history).

104.  The following items constitute "machine[s], instrument[s], or

contrivance[s]" under the CIPA (and even if they do not, Stripe's deliberate and

purposeful scheme that facilitated its interceptions falls under the broad statutory

catch-all category of "any other manner"): (i) Stripe.js, Stripe Elements, and the

Stripe SDKs, including the software code modules therein that are designed to

intercept, collect, transmit, and track consumers' private information; (ii) Stripe

Radar, including the software code modules therein that are designed to collect

and/or transmit consumers' private information; (iii) the Stripe computer servers,

including the software code modules installed on those servers used to intercept,

receive, transmit, read, track, analyze, and sell such private information; and (iv)

the plan Stripe carried out to intercept, collect, transmit, read, track, analyze, and

sell the California Class members' private information, even though they had not

consented (collectively, the "Stripe Instruments").

105.   The private information that was intercepted, collected, transmitted,

received, tracked, and analyzed by the Stripe Instruments included at least the

following information regarding each consumer:

- full name;

- home and/or delivery address;

- billing address;

- telephone number;

- email address;

- credit and/or debit card number, expiration date, and CVV number;

- internet IP addresses;

- the brand and model of the consumer's computers or electronic devices;

- the identities of the consumer's browsers;

- the operating systems that the consumer's devices were using;

- the unique tracking codes (entitled "private_machine_identifier"), which

  enables Stripe to identify a particular consumer and track his or her

  activities across its entire merchant network, enabling Stripe to gather

  even more sensitive data about the consumer including, without limitation,

  (i) the number of declined cards that the consumer has used with Stripe

  merchants; (ii) how long ago one of the consumer's cards was last

  declined; (iii) whether the consumer had ever disputed a previous Stripe

  charge; (iv) whether any previous early fraud warnings were associated

  with the consumer; (v) the percentage of transactions that were authorized

for the consumer over time; and (vi) the cards and other payment methods associated with the consumer's IP address.

(collectively, the information listed in the bullet points above shall be referred to as "Private Information.")

106.   By enabling the Stripe Instruments to intercept, collect, transmit, receive, track, and analyze consumers' Private Information without their consent, and by communicating and selling that Private Information to Stripe merchants, Stripe violated Section 631(a) of the Privacy Act. In particular, Stripe:

- intentionally tapped, electrically or otherwise, the lines and/or instruments of internet communication being used by California Class members to access merchant websites;

- intentionally made unauthorized connections, electrically or otherwise, with the lines and/or instruments of internet communication being used by California Class members to access merchant websites;

- willfully, and without the consent of California Class members, read and learned the contents and/or meaning of their messages and communications containing private information, while the same was in transit or passing over lines of internet communication, or was being sent from and received at locations in California;

- used California Class members' private information to increase Stripe's profits;

- communicated and sold California Class members' Private Information to Stripe's merchant customers; and

- aided, agreed with, and conspired with other persons (including, without limitation, Instacart) to unlawfully do, permit, and cause to be done the above-listed activities.

107.   The California Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy; (ii) loss of value in their Private Information; and (iii) the price premium they were unknowingly charged by Instacart to compensate for Stripe's fees, for if they had been informed regarding Stripe's unauthorized activities, they would not have entered into financial transactions with merchants that use Stripe Elements.

108.   The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

109.   Unless enjoined, Stripe will continue to commit the illegal acts alleged here. The California Class Members continue to be at risk because they frequently use the internet to search for information about products and services. They continue to desire to use the internet for that purpose, including for the purpose of shopping for various products and services. Defendant Stripe has intentionally designed Stripe Elements to omit reference to Stripe, and to appear as though Stripe is not involved in the transaction. Accordingly, the California Class Members have no practical way to know if their website communications will be monitored or recorded by Stripe. Further, Stripe has already collected their Private Information, and is currently sharing, and will continue sharing, that information with its other merchant customers, unless and until enjoined by this Court.

110.   The California Class Members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**Second Cause of Action**

**Violation of the California Invasion of Privacy Act,
California Penal Code § 635**

**(On Behalf of Mr. Silver, Ms. Lienhard, and the California Class)**

111.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

112.   California Penal Code § 635 provides as follows:

> Every person who manufactures, assembles, sells, offers for sale, advertises for sale, possesses, transports, imports, or furnishes to another any device which is primarily or exclusively designed or intended for eavesdropping upon the communication of another, or any device which is primarily or exclusively designed or intended for the unauthorized interception or reception of communications between cellular radio telephones or between a cellular radio telephone and a landline telephone in violation of Section 632.5, or communications between cordless telephones or between a cordless telephone and a landline telephone in violation of Section 632.6 , shall be punished by a fine not exceeding two thousand five hundred dollars.

113.   Stripe intentionally manufactured, assembled, sold, offered for sale, advertised for sale, possessed, transported, imported, and/or furnished one or more wiretap devices (i.e., the Stripe Instruments, including the software code modules therein) primarily or exclusively designed or intended for eavesdropping upon the communication of another.

114.   In particular, the Stripe Instruments contain software code modules that are primarily or exclusively designed to intercept, collect, transmit, receive, and track communications that California Class members reasonably (but erroneously) believed would be sent directly and exclusively to the merchant. Further, although the California Class members intended to provide only information necessary for the purchase of products and services, and to provide that information directly and

exclusively to the merchant, the software code modules of the Stripe Instruments were designed to (and in fact did) intercept, collect, transmit, receive, track, analyze, and sell the Private Information of the California Class members.

115.  The California Class members did not consent to any of Stripe's actions in implementing its wiretaps.

116.  The California Class members have suffered loss by reason of these violations, including, but not limited to, (i) violation of their right to privacy; (ii) loss of value in their Private Information; and (iii) the price premium they were unknowingly charged by Instacart to compensate for Stripe's fees, for if they had been informed regarding Stripe's unauthorized activities, they would not have entered into financial transactions with merchants that use Stripe Elements.

117.  The violation of section 635 constitutes an invasion of privacy sufficient to confer Article III standing.

118.  Unless enjoined, Stripe will continue to commit the illegal acts alleged here. The California Class Members continue to be at risk because they frequently use the internet to search for information about products and services. They continue to desire to use the internet for that purpose, including for the purpose of shopping for various products and services. Defendant Stripe has intentionally designed Stripe Elements to omit reference to Stripe, and to appear as though Stripe is not involved in the transaction. Accordingly, the California Class Members have no practical way to know if their website communications will be monitored or recorded by Stripe. Further, Stripe has already collected their Private Information, and is currently sharing, and will continue sharing, that information with its other merchant customers, unless and until enjoined by this Court.

119.   The California Class members seek all relief available under Cal. Penal Code § 637.2, including injunctive relief and statutory damages of $5,000 per violation.

**Third Cause of Action**

**Violation of the Florida Security of Communications Act,
Florida Statutes § 934**

**(On Behalf of Ms. Tysinger and the Florida Class)**

120.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

121.   Section 934 of the Florida Statutes provides for a civil cause of action against anyone who:

> (a) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication;
>
> ….
>
> (c)   Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; [or]
>
> (d)   Intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

(Fla. Stat. § 934.03(1). *See also* Fla. Stat. § 934.10 (providing for civil cause of action).)

122.   Stripe intentionally intercepted and endeavored to intercept the electronic communications of members of the Florida Class, including Ms.

Tysinger. In particular, Stripe intercepted and endeavored to intercept the Private Information of Florida Class members.

123.   Stripe intentionally disclosed, endeavored to disclose, to other persons the contents of the Florida Class members' electronic communications, including their Private Information, knowing and/or having reason to know that the information was obtained through the interception their electronic communications. In particular, as discussed above (*see supra*, Substantive Allegations, Section B; Fig. 1), Stripe made the contents of these communications, including the Private Information, available to its other merchants, including through its Radar product.

124.   Stripe intentionally used, and endeavored to use, the contents of the Florida Class members' electronic communications, knowing and/or having reason to know that the information was obtained through the interception their electronic communications. In particular, as discussed above (*see supra*, Substantive Allegations, Section B; Fig. 1), Stripe made the contents of these communications, including the Private Information, available to its other merchants, including through its Radar product. In addition, Stripe used the contents in its machine learning algorithms to, among other things, assign Risk Scores to transactions associated with the Florida Class members.

125.   The Florida Class members did not consent to any of Stripe's actions in implementing its wiretaps and in providing and using their electronic communications and Private Information.

126.   Stripe's conduct actually and proximately caused the Florida Class members to lose money or property. Absent Stripe's unfair and fraudulent conduct, the Florida Class members would have behaved differently and would

1   not have entered into financial transactions with merchants who use Stripe

2   Elements. Further, Stripe's unlawful activities and use of the Florida Class

3   members' Private Information enabled it to charge transaction fees to merchants,

4   the price of which the Florida Class members covered through increased merchant

5   fees.

6       127.   The Florida Class members seek all relief available under Section 934

7   of the Florida Statutes, including without limitation actual damages, and

8   liquidated damages computed at the rate of $100 a day for each day of violation.

9

10                              **Fourth Cause of Action**

11            **Violation of the Revised Code of Washington § 9.73.030**

12              **(On Behalf of Ms. Waters and the Washington Class)**

13       128.   Plaintiffs reallege and incorporate by reference all paragraphs alleged

14   herein.

15       129.   Section 9.73.030 of the Revised Code of Washington states as follows:

16          (1) Except as otherwise provided in this chapter, it shall be
           unlawful for any individual, partnership, corporation,
17         association, or the state of Washington, its agencies, and
           political subdivisions to intercept, or record any:
18
           (a) Private communication transmitted by telephone,
19         telegraph, radio, or other device between two or more
           individuals between points within or without the state by
20         any device electronic or otherwise designed to record
           and/or transmit said communication regardless how such
21         device is powered or actuated, without first obtaining the
           consent of all the participants in the communication;
22
           …
23
           (b)(3) Where consent by all parties is needed pursuant to
24         this chapter, consent shall be considered obtained whenever
           one party has announced to all other parties engaged in the
25         communication or conversation, in any reasonably effective
           manner, that such communication or conversation is about
26         to be recorded or transmitted: PROVIDED, That if the

conversation is to be recorded that said announcement shall
also be recorded.

(RCW § 9.73.030. *See also* RCW § 9.73.060 (providing for civil cause of

action).)

130.   Stripe intercepted and recorded the private communications transmitted

by device between Washington Class members, on the one hand, and Instacart

(including individuals employed by Instacart), or the other hand, by using the

Stripe Instruments, which were designed to record and transmit said

communications, without obtaining the consent of Washington Class members.

131.   Neither Instacart nor Stripe announced at any time that such

communications would be recorded or transmitted to Stripe.

132.   Stripe's conduct actually and proximately caused the Washington Class

members to lose money or property. Absent Stripe's unfair and fraudulent

conduct, the Washington Class members would have behaved differently and

would not have entered into financial transactions with merchants who use Stripe

Elements. Further, Stripe's unlawful activities and use of the Washington Class

members' Private Information enabled it to charge transaction fees to merchants,

the price of which the Washington Class members covered through increased

merchant fees.

133.   The Washington Class members seek all relief available under Section

9.73.060 of the Revised Code of Washington, including without limitation actual

damages; liquidated damages computed at the rate of $100 a day for each day of

violation; reasonable attorneys' fees; and other costs of litigation.

**Fifth Cause of Action**

**Violation of the Utah Notice of Intent to Sell Nonpublic
Personal Information Act, Utah Code § 13-37**

**(On Behalf of Ms. Jones and the Utah Class)**

134.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

135.   Section 13-37-201 of the Utah Code states that each commercial entity must, when certain conditions are met, provide the following specific notice to consumers: "We may choose to disclose nonpublic personal information about you, the consumer, to a third party for compensation." (Utah Code § 13-37-201(3).)

136.   The Utah Code provides that the following conditions trigger the requirement to provide the notice to a person:

(1)(a)(i) the commercial entity enters into a consumer transaction with that person;

(ii) as a result of the consumer transaction described in this Subsection (1)(a), the commercial entity obtains nonpublic personal information concerning that person; and

(iii) the commercial entity intends to or wants the ability to disclose the nonpublic personal information:

   (A) to a third party; and

   (B) for compensation; and

      (iv) the compensation described in Subsection (1)(a)(iii)(B):

         (A) is the primary consideration for the commercial entity disclosing the nonpublic personal information;

         (B) is directly related to the commercial entity disclosing the nonpublic personal information; and

         (C) is not compensation received by the commercial entity in consideration of a transaction described in Subsection (5).

(b) For purposes of this chapter, a commercial entity is considered to have obtained information as a result of a consumer transaction if:

(i) the person provides the information to the commercial entity:

(A) at any time during the consumer transaction; and

(B) at the request of the commercial entity; or

(ii)

(A) the commercial entity otherwise obtains the information; and

(B) but for the consumer transaction, the commercial entity would not obtain the information.

. . . .

(5) Notwithstanding the other provisions of this section, a commercial entity is not required to provide notice under this section if:

(a) the disclosure of the nonpublic personal information is related to the third party providing to the commercial entity:

(i) services, including business outsource services;

(ii) personal or real property; or

(iii) other thing of value; and

(b) compensation received by the commercial entity as part of the transaction is received by the commercial entity for or in consideration of the transaction described in Subsection (5)(a).

(Utah Code § 13-37-102. *See also* Utah Code § 13-37-202 (providing for civil cause of action).)

137.   Stripe's activities meet the conditions recited above. First, Stripe is a "commercial entity" within the meaning of Utah Code § 13-37-102(2) because it engages in consumer transactions as part of its regular course of business, and because it has an office in Utah, at 1108 E. South Union Avenue, Midvale, Utah 84047.

138.   Second, Stripe entered into consumer transactions with the Utah Class members. The Utah Class members are consumers, and were shopping for goods and/or services, primarily for personal, family, or household purposes. After Stripe surreptitiously solicited their Private Information, including their credit and debit card information, they provided that information to complete their purchases. Other Private Information obtained by Stripe regarding the Utah Class members included information regarding their credit worthiness and purchasing patterns. Stripe directly benefitted from the consumer transactions, in part because it retained a percentage of those transactions as its fee.

139.   Third, as a result of these consumer transactions, Stripe obtained the Private Information of the Utah Class members.

140.   Fourth, Stripe intended to and wanted the ability to disclose the Utah Class members' Private Information to third parties for compensation. Specifically, Stripe intended to, wanted to, and in fact did, disclose the Private Information to its third party merchant customers, as part of Stripe's Payments product offering to those customers (for which Stripe charges transaction fees), as well as part of Stripe Radar (for which Stripe charges additional fees). The Private Information includes, but is not limited to, the information shown in Figure 1 above.

141.   Fifth, the compensation that Stripe received from its merchant customers for the Private Information was the primary consideration for Stripe disclosing the Private Information, and was directly related to Stripe disclosing it. Indeed, Plaintiffs are aware of no other consideration that Stripe received for disclosing the Private Information.

142.   Finally, the compensation that Stripe received for disclosing the Private Information was not related to the third parties (i.e., the merchants) providing services, personal or real property, or other thing of value to Stripe.

143.   Although Stripe was required to provide the Utah Class members with the notice set forth in Section 13-37-201(3) of the Utah Code, Stripe did not provide Utah Class members with that notice. In fact, Stripe intentionally masked its identity from the Utah Class members.

144.   The Utah Class members seek all relief available under Section 13-37-203 of the Utah Code, including without limitation $500 for each time Stripe failed to provide the required notice, and court costs.

**Sixth Cause of Action**

**Invasion of Privacy Under California's Constitution**

**(On Behalf of Mr. Silver, Ms. Lienhard, and the California Class)**

145.   Plaintiffs reallege and incorporate the paragraphs of this Class Action Complaint as if set forth herein.

146.   California's constitution creates a right to privacy, and further creates a right of action against private entities such as Stripe.

147.   The principal purpose of this constitutional right is to protect against unnecessary information gathering, use, and dissemination by public and private entities, including Stripe.

148.   To plead a California constitutional privacy claim, a plaintiff must show an invasion of (i) a legally protected privacy interest; (ii) where the plaintiff had a reasonable expectation of privacy in the circumstances; and (iii) conduct by the defendant constituting a serious invasion of privacy.

149.   Stripe has intruded upon the following legally protected privacy interests of the California Class members: (i) the California Wiretap Act as alleged above; (ii) the California Constitution, which guarantees Californians the right to privacy; and (iii) a Fourth Amendment right to privacy.

150.   The California Class members had a reasonable expectation of privacy. They directed their electronic devices to access the Instacart website, and to form an encrypted connection with that website, at https://www.instacart.com. When they were presented with the payment form on Instacart's website, they reasonably expected that their Private Information would be sent, in encrypted form, to Instacart. They reasonably expected that no third party, such as Stripe, would intercept and obtain the Private Information they submitted using the forms. They further reasonably expected that no third party, such as Stripe, would obtain Private Information about them that was not included on the form, such as their IP addresses, device identities, and operating systems. The California Class members further reasonably expected that no one would make their Private Information available to other merchants, as Stripe routinely does.

151.   Stripe's actions constituted a serious invasion of privacy in that it invaded a zone of privacy protected by the Fourth Amendment (i.e., one's personal communications), and violated criminal laws on wiretapping and invasion of privacy. These acts constitute an egregious breach of social norms that is highly offensive.

152.   Stripe's intentional intrusion into the California Class members' privacy was also highly offensive to a reasonable person in that Stripe violated criminal and civil laws designed to protect individual privacy and against theft.

153.   Stripe lacked a legitimate business interest in enabling the Stripe Instruments to intercept, collect, transmit, receive, track, analyze, and sell the Private Information of the California Class members without their consent.

154.   The California Class members have been damaged by Stripe's invasion of their privacy and are entitled to just compensation and injunctive relief.

## Seventh Cause of Action

### Intrusion Upon Seclusion

### (On Behalf of Mr. Silver, Ms. Lienhard, and the California Class)

155.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

156.   A plaintiff asserting a claim for intrusion upon seclusion must plead (i) that the defendant intentionally intruded into a place, conversation, or matter as to which the plaintiff had a reasonable expectation of privacy; and (ii) that the intrusion was highly offensive to a reasonable person.

157.   By enabling the Stripe Instruments to intercept, collect, transmit, receive, track, and analyze consumers' Private Information without their consent, and by communicating and selling that Private Information to Stripe merchants, Stripe intentionally intruded upon the solitude or seclusion of the California Class members, in that Stripe effectively placed itself in the middle of communications to which it was not invited, welcomed, or authorized.

158.   The California Class members did not consent to, authorize, or know about Stripe's intrusion at the time it occurred. Further, they never agreed that Stripe could install a tracking cookie on their devices to track them across the Stripe merchant network, nor did they agree that Stripe could transmit, receive,

track, and analyze their private information, and disclose that information to other merchants in the Stripe network.

159.  Stripe's intentional intrusion on the California Class members' solitude or seclusion without consent would be highly offensive to a reasonable person. The California Class members reasonably expected, based on (i) the fact that they had established a secure, encrypted connection to the Instacart website; (ii) the fact that no disclosure was made to them that Stripe was involved in the transaction—indeed, Stripe did not even display its logo or the word "Stripe" at any point during the transactions at issue—that their Private Information would be submitted exclusively to the merchant, and would be used only for the purpose of making their purchase.

160.  Stripe's intentional intrusion into the California Class members' private conversations was highly offensive to a reasonable person in that it violated state laws designed to protect individual privacy.

161.  The surreptitious taking and disclosure of personal, confidential, and private information from the California Class members was highly offensive because it violated expectations of privacy that have been established by general social norms. Privacy polls and studies consistently show that the overwhelming majority of Americans believe one of the most important privacy rights is the need for an individual's affirmative consent before personal data is harvested or shared.

162.  Stripe intentionally engages in the misconduct alleged herein to generate substantial profit, not only through its transaction fees, but also by improving the functionality of its products by assessing Risk Scores, and by

selling consumers' Private Information, through its Stripe Radar product, to Stripe merchants.

163.   As a result of Stripe's actions, the California Class members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

164.   Unwanted access to data by electronic or other covert means, in violation of the law or social norms is actionable under California law.

165.   The California Class members have been damaged as a direct and proximate result of Stripe's invasion of their privacy and are entitled to just compensation.

166.   The California Class members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate them for the harm to their privacy interests as well as disgorgement of profits made by Stripe as a result of its intrusions upon the California Class members' privacy.

**Eighth Cause of Action**

**Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200, et seq.**

**(On Behalf of Mr. Silver, Ms. Lienhard, and the California Class)**

167.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

168.   Stripe is a "person" under Cal. Bus. & Prof. Code § 17201.

169.   Stripe created and implemented a scheme to obtain the Private Information from the California Class members through a pervasive pattern of false and misleading omissions. Stripe concealed and failed to disclose to the California Class members the following facts: (i) that the Stripe Elements forms

were being provided by Stripe; (ii) that Stripe would intercept the communications, including the Private Information, that California Class members reasonably believed would be sent directly and exclusively to the merchant; (iii) that Stripe would collect and store the California Class members' Private Information, including information entered by them in the forms, as well as other Private Information not expressly provided by them; (iv) that Stripe would install a tracking cooking on their devices and track their behavior across its entire merchant network; (v) that Stipe would sell and make that information available to its other customers; (vi) that Stripe would continue to monitor the status of the transactions with their banks, including whether and why they disputed the charges; or (vii) that Stripe would use the information to affect future financial transactions performed by the California Class members. Indeed, Stripe concealed and failed to disclose its identity to the California Class members; it did not disclose that it was involved in the transactions at all.

170.   These omissions were misleading and deceptive.

171.   Stripe's conduct was unfair and unconscionable, particularly because Stripe intruded on communications that the California Class members reasonably believed to be private, and also because Stripe made and/or offered to make their Private Information available to any of its merchant customers who, at any time in the past or future, were involved in a financial transaction with the California Class members.

172.   Stripe's conduct was fraudulent and deceptive because the omissions at issue were likely to, and in fact did, deceive reasonable consumers, including the California Class members. Reasonable consumers, including the California Class members, would have found it material to their purchasing decisions that Stripe

would intercept, collect, transmit, receive, track, and analyze consumers' private information without their consent, and make that Private Information available to Stripe merchants. Knowledge of these facts would have been a substantial factor in the California Class members' decisions to engage in financial transactions involving Stripe.

173.   Stripe owed the California Class members a duty to disclose these facts because they were exclusively known and/or accessible to Stripe, who had superior knowledge of its activities with respect to the private information of the California Class members; because Stripe actively concealed the facts; and because Stripe intended for consumers to rely on the omissions in question.

174.   As set forth above (*see supra*, Substantive Allegations, Section D), in engaging in financial transactions using Stripe Elements, the California Class members relied on Stripe's omissions. Reasonable consumers would have been expected to have relied on the omissions, particularly because they had directed their browsers and/or mobile applications to visit and establish secure connections to the merchant's website, and because they were not informed that Stripe would intercept and receive their communications, which they believed would be sent directly and exclusively to the merchant over the secure connection with the merchant website.

175.   Stripe's conduct was also unlawful in that it violated the following statutes: the California Invasion of Privacy Act, Cal. Penal Code §§ 635 and 637; the California Online Privacy Protection Act of 2003 ("CalOPPA"), Cal. Bus. & Prof. Code § 22575 et seq.; and the California Consumer Privacy Act of 2018, Cal. Bus. & Prof. Code § 1427 et seq.

176.   Stripe engaged in conduct that is unfair and unconscionable because its activities with respect to California Class members' Private Information offends public policy, is immoral unethical, oppressive, outrageous, unscrupulous, and substantially injurious, and has cause substantial harm that greatly outweighs any possible utility from the conduct.

177.   Stripe's conduct actually and proximately caused the California Class members to lose money or property. Absent Stripe's unfair and fraudulent conduct, Plaintiffs and Class Members would have behaved differently and would not have entered into financial transactions involving Stripe. Further, Stripe's unlawful activities and use of the California Class members' Private Information enabled it to charge transaction fees to merchants, the price of which the California Class members covered through increased merchant fees.

178.   The California Class members seek—on behalf of themselves and each member of the class—restitution, injunctive relief, and reasonable attorneys' fees, as well as any other relief the Court may deem just or proper.


**Ninth Cause of Action**

**Unjust Enrichment**

**(On Behalf of All Plaintiffs and Classes)**

179.   Plaintiffs reallege and incorporate by reference all paragraphs alleged herein.

180.   Stripe created and implemented a scheme to increase its own profits through a pervasive pattern of false and misleading omissions. Stripe aimed to hide its identity from Plaintiffs and Class Members in order to collect, sell, and use their Private Information.

181.   Stripe was unjustly enriched as a result of its wrongful conduct, including through its concealment and failure to disclose the following facts: (i) that the Stripe Elements forms were being provided by Stripe; (ii) that Stripe would intercept the communications, including the Private Information, that the Class Members reasonably believed would be sent directly and exclusively to the merchant; (iii) that Stripe would collect and store the Class Members' private Information, including information entered by them in the forms, as well as other Private Information not expressly provided by them; (iii) that Stripe would install a tracking cooking on the Class Members' devices and track their behavior across its entire merchant network; (iv) that Stipe would make that information available to its other customers; (v) that Stripe would continue to monitor the status of the transactions with their banks, including whether and why they disputed the charges; or (vi) that Stripe would use the information to affect future financial transactions performed by the Class Members. Indeed, Stripe concealed and failed to disclose its identity to the Class Members; it did not disclose that it was involved in the transactions at all.

182.   Stripe received a measurable benefit at the expense of the Class Members in the form of fees associated with processing merchants' payments, as well as fees obtained by using the Class Members' Private Information, and selling the Private Information to its merchant customers, including by charging fees for its Radar service.

183.   Stripe appreciated, recognized, and chose to accept the monetary benefits that the Class Members conferred onto Stripe at their detriment. These benefits were the expected result of Stripe acting in its pecuniary interest at the expense of the Class Members.

184.   There is no justification for Stripe's enrichment. It would be inequitable, unconscionable, and unjust for Stripe to be permitted to retain these benefits because the benefits were procured as a result of its wrongful conduct. The Class Members are entitled to restitution of the benefits Stripe unjustly retained and/or any amounts necessary to return the Class Members to the position they occupied prior to having their Private Information obtained by Stripe.

185.   The Class Members plead this claim separately as well as in the alternative to their other claims, as without such claims they would have no adequate legal remedy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and those similarly situated, respectfully request that the Court enter judgment against Defendant as follows:

A.   Certification of the proposed Classes, including appointment of Plaintiffs' counsel as class counsel;

B.   An award of compensatory damages, including statutory damages where available, to Plaintiffs and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial, including both pre- and post-judgment interest thereon;

C.   An order for full restitution;

D.   An order requiring Defendant to disgorge revenues and profits wrongfully obtained;

E.   An order temporarily and permanently enjoining Defendant from continuing the unlawful, deceptive, fraudulent, and unfair business

practices alleged in this Complaint;

F.  For reasonable attorneys' fees and the costs of suit incurred; and

G.  For such further relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

Dated: November 19, 2020                    **GUTRIDE SAFIER LLP**

                                            */s Seth A. Safier*
                                            Seth A. Safier, Esq.
                                            Todd Kennedy, Esq.
                                            100 Pine Street, Suite 1250
                                            San Francisco, CA 94111