Pages 1 - 24

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | | |
|---|---|---|
| JASEN SILVER, ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | NO. C-20-8196 YGR |
| | ) | |
| vs. | ) | Tuesday, April 20, 2021 |
| | ) | |
| STRIPE, INC., | ) | Oakland, California |
| | ) | |
| | ) | MOTION TO DISMISS |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:        GUTRIDE SAFIER LLP
                       100 Pine Street, Suite 1250
                       San Francisco, California 94111
                  **BY:  HALEY REYNOLDS, ESQUIRE**


For Defendant:         MUNGER, TOLLES & OLSON LLP
                       560 Mission Street, 27th Floor
                       San Francisco, California 94105
                  **BY:  JONATHAN H. BLAVIN, ESQUIRE**


Reported By:           Diane E. Skillman, CSR 4909, RPR, FCRR
                       Official Court Reporter

        TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

```
 1    Tuesday, April 20, 2021                          2:00 p.m.

 2                     P R O C E E D I N G S

 3                            o0o

 4         THE CLERK:  Calling Civil action 20-8196 Jasen Silver

 5    versus Stripe, Inc.

 6       Counsel, please state your appearances.

 7         MS. REYNOLDS:  Good afternoon, Your Honor.  Haley

 8    Reynolds from Gutride Safier representing plaintiffs.

 9         MR. BLAVIN:  Good afternoon, Your Honor.  Jonathan

10    Blavin from Munger, Tolles & Olsen representing defendant

11    Stripe.

12         THE COURT:  Okay.  Good afternoon.

13       So, Ms. Reynolds, I can tell you, we'll start with you,

14    but having reviewed and considered this action, I plan on

15    granting the motion to dismiss.

16       Ultimately the question will be -- I will give you leave

17    to amend, but ultimately the question will be whether you're

18    going to want to amend quickly or you want to wait for me to

19    issue a big order and then you can amend after that.  So I

20    want you to keep that in mind.

21       I think the main issue that I have is this issue of

22    consent.  And I think it's something that you are really going

23    to need to wrestle with.  I do think it's appropriate to

24    grant, in light of the nature of the complaint, to grant the

25    Request for Judicial Notice.  And given what this website --
```

1    given what has been presented to the customers, it appears to

2    me, just from the face of the screen, that they have

3    consented.

4        The notion that third parties can't be used, I just don't

5    think that that's the law for purposes of consent.  And

6    especially, I may not -- sure, Mr. Blavin can go through his

7    PowerPoint if you want, I'm sure you've seen it and you saw it

8    before, but it's not only reasonable, it's explicit.

9        You want to address the issue of consent?

10            **MS. REYNOLDS:**  Yes, Your Honor.

11        I think that there are a number of issues, but -- of

12    whether or not it is appropriate to consider the Instacart

13    Privacy Policy, but I will jump to if you are considering that

14    policy, there needs to be a matching of the conduct with what

15    is actually disclosed.

16        And under California law, the interpretation becomes a

17    matter of contract interpretation.  And at the motion to

18    dismiss stage, the law is that where there is more than one

19    reasonable interpretation, that we must find the

20    interpretation in favor of the plaintiff.

21        And here, I think that the Instacart policy discloses what

22    Instacart may collect and what Instacart may do with that

23    information that it collects, but it does not disclose that

24    Stripe is going to directly intercept that data, that it is

25    going to collect that data and that it is going to create

1    financial profiles of the users.

2         **THE COURT:**  Okay.  Well, I do have an issue with your

3    use of the word "intercept."  I have written on this before.

4    I don't think it is an interception, but continue.

5         **MS. REYNOLDS:**  Well, Your Honor, you know, according

6    to plaintiffs' allegations, Instacart doesn't ever receive

7    this information.  This information is taken before it gets to

8    Instacart and, therefore, would be considered, as we laid out

9    in our brief, an interception of that data.

10        And, again, the policy discloses looking to the provisions

11   which --

12        **THE COURT:**  So the consent provision says that it is

13   being -- that the information goes to Instacart and its

14   partners.  It is not unreasonable for an entity like Instacart

15   to use third-party payment processors.  I mean, it's not.

16   It's not unreasonable.  It's not unexpected.  And so you're

17   making a distinction where I don't think one exists.

18        **MS. REYNOLDS:**  I think it exists in two ways based on

19   what Your Honor just said.

20        That is, one, as I said, Instacart discloses what it will

21   share, not that Stripe is going to directly receive this

22   information.  And to the extent that Instacart does disclose

23   that it's going to use a third-party payment processor, that

24   use is limited to the validation and charge of the credit card

25   not to -- it does not disclose that Stripe -- that third-party

1   payment processor is going to collect a whole profile, track

2   that user across all merchants that are within its network,

3   and then create risk profile insights and all kinds of other

4   information as we allege in the complaint.  That is simply

5   nowhere to be found in this policy.

6       So I disagree that the scope of the consent would match

7   the conduct that Stripe is -- that is at issue here.

8            **THE COURT:**  Mr. Blavin.

9            **MR. BLAVIN:**  Thank you, Your Honor.

10      With Your Honor's permission, I can put up the privacy

11  policy just to go through the provisions which we contend

12  match the exact conduct that's challenged.

13           **THE COURT:**  All right.  We'll allow you to share your

14  screen.

15           **MR. BLAVIN:**  Thank you, Your Honor.

16                    (Displayed on screen.)

17      Your Honor, this is the Instacart Privacy Policy.  It

18  specifically states that the information at issue may be

19  shared with third parties who help enable the service and it

20  specifically discusses payment processing partners as part of

21  those services.

22      It further notes that we may share information when we

23  believe the disclosure is reasonably necessary to prevent,

24  detect, or otherwise handle fraud.

25      And the allegations in the complaint, and I would direct

1    the Court to paragraphs 32 and 35 specifically state that

2    Stripe creates these risk profiles and shares them to, quote,

3    "detect and prevent fraud" and that Stripe uses the data to,

4    quote, "assess risk and predict fraud."

5         So by their very own allegations, the use that is

6    challenged is encompassed by the Instacart Privacy Policy.

7    And the Instacart says "share" as opposed to some other type

8    of technical language; that's immaterial.

9         In the *Garcia* case and the *Javier* case that we've cited,

10   all of them dealt with claims of interception under CIPA, and

11   the Court found sufficient language where the privacy policy

12   said we may share this information with third parties.

13        Further, the privacy policy specifically identifies the

14   following categories of information which may be shared with

15   third parties.  All of this information that is highlighted on

16   the screen is exactly what they challenge in the complaint as

17   being shared.

18        This is another page which further discloses the

19   particular types of information which are collected and shared

20   with third parties.

21        And with respect to the allegations that Stripe may be

22   applying the cookie and tracking users over its Stripe

23   merchant network, that is also disclosed in the Instacart

24   Privacy Policy.  It says specifically our partners use various

25   technologies to collect information, including but not limited

1    to cookies, pixels, scripts, and device identifiers, and then,

2    our partners may use these technologies to collect information

3    about your online activity over time and across different

4    websites or online services.

5        So it specifically encompasses all of the challenged

6    conduct at issue and courts have held that; the fact that a

7    web page has its own privacy policy, whether or not that would

8    encompass the use of a third-party vendor.

9        And recently, the *Javier versus Assurance* case, which we

10    cited in our reply paper which came out after the Motion to

11    Dismiss was filed, there the plaintiffs sued both Assurance

12    and Active Prospect, the third-party vendor.  Active Prospect

13    was not specifically identified in the privacy policy, but the

14    Court found consent established again with respect to a CIPA

15    claim.  As a matter of law, where the policy said we may use

16    third-party vendors to assist us with the service, including

17    monitoring and analyzing site activity, the Court found

18    consent, both for Assurance and for Active Prospect as the

19    third-party vendor.

20        We think Your Honor is correct that the privacy policy

21    here clearly encompasses the conduct at issue, and there's

22    really no dispute with respect to what the policy states and

23    what the claims allege.

24        **MS. REYNOLDS:**  Your Honor, I would point out, if I

25    may, that the cases to which defendant points all were cases

1    that dealt with a defendant and that defendant's privacy

2    policies.  So it was a little bit more apples to apples when

3    comparing the conduct at issue as compared to the privacy

4    policy.

5        Here, we did not have the defendant's privacy policy;

6    instead, Stripe is relying on Instacart, the third-party's

7    privacy policy to say that there was an implied consent to

8    Strike intercepting, collecting, using the data as it will.

9        And that's just simply not what the case law allows.  The

10   case law does not allow a finding of consent when the use of

11   that data goes far beyond what it has consented to.

12       Looking to the *Javier* case, the explicit piece of data

13   that was at issue was an allegation that the third party had

14   created a screen capture of a person clicking on the site for

15   purposes of compliance with TCPA, and the policy, lo and

16   behold, did disclose that exact type of behavior, the

17   monitoring and analyzing of site activity and that a third

18   party would be used for that purpose.

19       Here, again, we arguably have consent that Instacart may

20   share data, credit card information with a credit card

21   processor.  We do not see anywhere consent to the scope to

22   which Instacart -- excuse me, Stripe is collecting and using

23   that data after it intercepts that data before it even reaches

24   Instacart.

25            THE COURT:  I don't recall you focusing on this issue

1    of implied consent.  And perhaps that's because you weren't

2    dealing with the explicit policy.

3              **MS. REYNOLDS:**  Your Honor, we do --

4              **THE COURT:**  Go ahead.

5              **MS. REYNOLDS:**  I was going to say, I believe we did

6    mention it in our opposition.  Specifically --

7              **THE COURT:**  I mean in the complaint.

8              **MS. REYNOLDS:**  I am sorry.

9              **THE COURT:**  You haven't really alleged a

10   sufficient -- there aren't really allegations to deal with

11   this implied consent issue.

12             **MS. REYNOLDS:**  That's because none of our claims

13   require a pleading of consent at all.  There are CIPA claims

14   that do have consent as an explicit element, for example,

15   Section 632.  But Section 631 does not actually have an

16   element of consent that must be pled.  And that's why it is

17   not in our complaint.  And I would also add that's part of the

18   argument as to why going beyond the complaint is not

19   appropriate here because it becomes an affirmative defense

20   when it's not an element of our claims.

21             **THE COURT:**  Response.

22             **MR. BLAVIN:**  Your Honor, briefly on that point.  In

23   the *Hernandez versus Path* case from Your Honor, that involved

24   a 631 interception claim and a Federal Wiretap Act claim.  The

25   Court took judicial notice of Path's privacy policy, so the

1    Court clearly found in that case it was sufficient to consider

2    the privacy policy on a Motion to Dismiss with a 631 claim.

3    And courts repeatedly have held that 631 claims may be barred

4    as a matter of law based on allegations of consent, including

5    through the use of privacy policies.

6         And I would also just echo the point Your Honor made,

7    beyond the issue of consent, they haven't alleged plausibly or

8    sufficiently any type of interception.  Under their own

9    allegations, the information is sent directly from the user to

10   Stripe.  They allege nothing is sent to the servers of

11   Instacart.  There is no eavesdropping.  There's no stopping or

12   seizing of data.

13        That's exactly what the Court held in *Path* case.  That's

14   what Your Honor held in the *Marsh versus Zaazoom* case.

15   There's no interception in that instance.

16            **THE COURT:**  And that goes to -- we can move on here

17   to the first, third, and fourth cause of action.

18        The Wiretap Act requires an acquisition contemporaneous

19   with transition; meaning that an electronic communication is

20   stopped, seized, interrupted, in progress or course before

21   arrival.

22        And I don't know which one -- you mentioned me -- I wrote

23   the *Hernandez* decision, not the other one, but I do think that

24   we can look at the language of the statute and figure out

25   whether or not it was an interception.

1       What I don't see here is -- I just don't agree with your

2   view that there was an interception just because Instacart was

3   using a third-party vendor.  If it is, we have huge problems

4   across the internet.  I mean, it would be like every vendor

5   would be, you know, potentially subject to this.  I just don't

6   think that's either the intent of the statute or that the

7   allegations fall within the scope of the statute.  Period.

8          **MS. REYNOLDS:**  I understand Your Honor's concern, and

9   I think that there's a key distinction here when you look at

10  the case law that accounts for Your Honor's concern in the use

11  of third-party vendors.

12      One such case is *Gonzales versus Uber* case and even

13  *Hernandez versus Path*.  The issue in those cases, why there

14  was not a finding of interception is because the data was

15  taken from the defendant -- from another person's servers.

16      So, for instance, in *Gonzales versus Uber*, the plaintiff

17  claims that Uber was intercepting data that the plaintiff was

18  sending to Lyft.  But what was actually happening was that

19  Uber was taking that data from Lyft servers.  It was already

20  there, it was already at Lyft, and Uber took it from Lyft.

21  That's why there was not a finding of interception.

22      Similarly in *Path*, there was an issue of accessing

23  servers, accessing an address book which was accessing stored

24  information.  That information was already stored somewhere on

25  a server, and the plaintiff alleged that defendant was taking

1    that from the information that was stored on a server.

2        Here, the intended recipient is Instacart.  And the

3    information --

4        **THE COURT:**  That's where I disagree with you.  It may

5    be Instacart, but it is inconceivable to me that parties

6    cannot reasonably believe that Instacart is not the

7    be-all-and-end-all of making -- of making these transactions

8    happen.

9        And perhaps it's because I authorize wiretaps, real

10    wiretaps and it is nothing like this.  This is merely a

11    commercial transaction that is then shared with a third-party

12    vendor to enact -- to enact the transaction that the consumer

13    wants.

14        **MS. REYNOLDS:**  Your Honor, I don't -- I disagree with

15    the characterization that it is Instacart that is sharing.  If

16    that were the case, I would completely understand the concern.

17    Instacart's policy discloses that it shares information.

18        This is the equivalent of Instacart allowing Stripe to tap

19    a line.  And that's also important for purposes of looking at

20    the difference --

21        **THE COURT:**  Ms. Reynolds, how does that make any

22    logical, practical sense?  It is a lawyer's argument.  It is

23    not reality.

24        **MS. REYNOLDS:**  Your Honor, our position is that a

25    reasonable consumer has an expectation of privacy.  And that

1    is acknowledged by the fact that these privacy policies exist.

2    There would be no need for any of these privacy policies if we

3    didn't have a reasonable expectation of privacy.

4         The California legislature has enacted CIPA and has stated

5    in its legislative intent that it wants broad protection.  We

6    are not just talking about the use of a credit card for

7    purposes of processing a payment.  We are talking about a

8    third party taking that information, compiling their

9    transaction histories, what --

10             **THE COURT:**  That might be.  That might be.  There may

11   be something here, but it is not an interception.  There may

12   be some unlawful business practice, there may be overreach,

13   but it's not an interception.

14        Let's keep going.

15             **MR. BLAVIN:**  Your Honor, I am happy to walk through

16   the rest of the causes of action in the complaint if you would

17   like or if there's any specific questions regarding, you

18   know --

19             **THE COURT:**  I mean, again, the second cause of action

20   for eavesdropping, again, I don't think that it falls within

21   the scope of 635.

22             **MR. BLAVIN:**  Yes.

23        With respect to 635, again, it only applies to the use of

24   devices that are, quote, "primarily or exclusively designed or

25   intended for eavesdropping."

1      The fact there is no eavesdropping here at all, which I

2  think Your Honor has rightly recognized, means that Section

3  635 doesn't apply.

4      And, again, under their own allegations of the complaint,

5  the code, the software at issue here through a payment form is

6  used to process payments and to provide fraud detection and

7  prevention services.

8      So, putting aside the fact that there's no interception,

9  we don't think they have plausibly alleged that these devices

10  are primarily or exclusively designed for eavesdropping.

11      This is really meant to capture devices such as what Your

12  Honor was noting before that are actually used to tap people's

13  lines.  And the statute doesn't apply to the type of consumer

14  transaction at issue.

15          **THE COURT:**  Ms. Reynolds.

16          **MS. REYNOLDS:**  I think that takes some liberality

17  with the statute at issue here.  Defendant cites to Section

18  637.7 to try and confine the definition of device to be the

19  definition from 637.7, which is an electronic tracking device,

20  and that definition only applies to that section.

21      Section 635 is broader in that it uses the term "device."

22  And the Northern District has held that code can be a device,

23  and that these allegations were sufficient under those

24  circumstances in the *Moosejaw* case.

25          **MR. BLAVIN:**  Your Honor, just briefly on that.

1    That was a separate, independent argument that we made

2    that this isn't a device because it is software code.  We

3    think the *Moosejaw* case is distinguishable for multiple

4    reasons, but, again, there, there was a duplication of a

5    message that was sent to a server and then the duplicated

6    message was sent in parallel.  So there was actually a

7    sufficient allegation of an interception.  Nothing like that

8    is alleged here.

9        But, again, apart from the fact as to whether or not

10   software code can constitute a device, they haven't alleged an

11   underlying interception or eavesdropping which would even

12   trigger Section 635.

13        **MS. REYNOLDS:**  Your Honor, I think that gets us back

14   to the discussion we were just having where we disagree that

15   an interception has occurred because the communication was

16   intended for Instacart and instead went to Stripe.

17        **MR. BLAVIN:**  Your Honor, with respect to the Utah

18   code provision, which is included as one of the causes of

19   action in the complaint, this is Section 13-37-201, again,

20   consent would satisfy the allegations here, but for more

21   fundamental reasons, the statute doesn't even apply.  It

22   applies to a commercial entity that, quote, "enters into a

23   consumer transaction."

24        Under their own allegations, the entity, the commercial

25   entity that is entered into a consumer transaction is

1   Instacart.  Stripe is just a third-party vendor that is

2   providing services to Instacart.

3        So we think the statute just on its face doesn't even

4   apply to Stripe.  If it did apply in any fashion, it would

5   fall within the exception which allows, again, for uses.  Just

6   like at issue here, it creates an exception where the business

7   is providing business outsourced services, which this clearly

8   is.  Stripe is providing payment processing services for

9   Instacart and for detection and prevention services.

10           **THE COURT:**  Any response, Ms. Reynolds?

11        **MS. REYNOLDS:**  Your Honor --

12           **THE COURT:**  Go ahead.

13        **MS. REYNOLDS:**  I would, again, disagree.  The

14   transaction occurs with Stripe, whether the consumer wants it

15   to or not.  And while there is a business entity exception,

16   that doesn't apply here because that would apply for

17   Instacart's use of a third party, not Stripe.

18           **MR. BLAVIN:**  Your Honor, just briefly with respect to

19   the Constitutional common law privacy violation claims.

20        Again, we think consent would foreclose these claims as a

21   matter of law.  Moreover, as we cite in our motion and in our

22   reply papers, courts consistently have held that there's no

23   actionable privacy interest in the types of data, basic

24   digital data that was disclosed here or credit card

25   information.  Credit card information is available on the

1    fronts of the card itself.

2       Again, as Your Honor correctly identified here, the

3    context of this lawsuit is a user who voluntarily initiates a

4    transaction and provides this information through the payment

5    form.  So, this is not the type of activity that would fall

6    within constituting an egregious breach of social norms or be

7    highly offensive, or have any actionable privacy interest in

8    it.

9       The courts have made clear that the sharing of this basic

10   digital information doesn't rise to the level of a violation

11   of the right to privacy.  And, again, it is plainly

12   distinguishable from cases in which there's actually repugnant

13   surveillance measures which are used.  That's not what's at

14   issue here.

15       **THE COURT:**  So with respect to this one, you know,

16   perhaps there are other allegations, Ms. Reynolds, which, you

17   know, which would meet that high bar.  I mean, when I sit back

18   and look at this case, it just doesn't -- it just does not

19   come across as highly offensive.  And that is the bar.

20       I mean, we are trying to figure out, you know, what are

21   normal commercial transactions, and where something goes

22   beyond, beyond the pale with respect to that.

23       **MS. REYNOLDS:**  Your Honor, I think it is highly

24   offensive especially when you consider the aggregation of the

25   data that is used and then the repeated sharing of that data

1     after the aggregation occurs.

2         So Stripe collects the consumer information and then

3     shares that --

4             **THE COURT:**  Don't they share -- let me ask it this

5     way:  With whom do they share it?  Aren't they sharing it with

6     other vendors with whom the consumer is having contact?

7         I mean, they are not sharing it with people with whom

8     there's no interaction, right?

9             **MS. REYNOLDS:**  Well, as alleged in the complaint,

10    it's a network of millions of merchants.  And I think that it

11    may be reasonable that a consumer expects that I'm going to

12    make a purchase at Gap and then make a purchase at

13    Instacart --

14            **THE COURT:**  I'm going to interrupt you.  I'm trying

15    to understand this.

16        If Stripe collects the data, right, because they have --

17    they received it through Instacart, and then this person went

18    and they bought something from the local pizza shop, and that

19    pizza shop happened to use Stripe as well, but at the exact

20    same time, there was some other entity who fraudulently got

21    the credit card information and Stripe had that information,

22    and someone tried to use it, and Stripe said, no, no, no, that

23    seems to be fraudulent, isn't that good for the consumer?

24            **MS. REYNOLDS:**  Your Honor, I think your example

25    points to the problem with the consent at issue.  It is that

1    the plaintiff or consumer never consents to the use of the

2    data in that way.  So in your example, we would need to know

3    the consents of every merchant --

4            **THE COURT:**  What I need to know is, in terms of your

5    plaintiffs, what happened to their data that -- remember, you

6    have Rule 11 obligations.  You can't just throw stuff out

7    there.  Right?  You can't just throw it out there.  You have

8    to have a factual basis for what you are alleging.

9        What happened that was so horrible to these plaintiffs?

10   I'm struggling here.

11           **MS. REYNOLDS:**  Your Honor, it's the risk profile

12   that's created without the knowledge of the users.  So it's

13   not just a catch of someone misusing a credit card that

14   they've recreated fraudulently.  I agree that --

15           **THE COURT:**  So what happened?  Were you -- so what

16   happened?  Yeah, what happened that was so horrible?

17           **MS. REYNOLDS:**  It can result in a consumer not being

18   allowed to make a transaction because of their --

19           **THE COURT:**  What happened?

20           **MS. REYNOLDS:**  -- own history.

21           **THE COURT:**  What happened?

22           **MS. REYNOLDS:**  Well, Your Honor, we are at a point at

23   the complaint where we need further discovery --

24           **THE COURT:**  You have clients.  You have clients and

25   your complaint is based on something that happened to your

1  clients.  It is not hypothetical.  And if it is hypothetical,

2  it's not ripe.

3       MS. REYNOLDS:  What we know happened is their data

4  was collected without their consent.  It was compiled and a

5  risk profile was created for each of the users.

6       THE COURT:  And it just sat there.

7       MS. REYNOLDS:  It doesn't really matter what happens

8  beyond that because the harm is the collection of that data

9  and the use of it for business purposes --

10      THE COURT:  So they haven't used it.  What you said

11 is they collected it.

12      MS. REYNOLDS:  This is what we know at this point

13 because this is the type of information that is peculiarly in

14 the hands of the defendant.

15      THE COURT:  Well, is it?  That is, if somebody --

16 if -- I don't know that it is.

17    If somebody collected my data and then I went and I tried

18 to use my credit card, and someone said, no, can't do that

19 because we've got all this data on you, and you're not a good

20 risk.  You don't pay your bills, or something like that.  I

21 don't know.

22    Then I would know that they are -- then I would know

23 that -- how do they know that?  How have they been collecting

24 this information?

25      MS. REYNOLDS:  We know they have been collecting

1    information based on what Stripe said it does, which is laid

2    out in paragraph 8 of the complaint.

3        And it is plaintiffs' position that the collection and

4    creation of those profiles is a violation of their privacy

5    rights.  It is not something they consented to.  And even to

6    the extent that there is consent for use of a credit card for

7    payment processing purposes, that does not go so far as to

8    allow Stripe to do -- to create these user profiles and

9    collect vast amounts of data down to the average time of day

10   that a consumer makes a purchase.

11           **THE COURT:**  Okay.  So --

12           **MR. BLAVIN:**  Your Honor --

13           **THE COURT:**  So let me ask, because, you know, all of

14   this -- all of these issues really interact in terms of the

15   UCL claims.  I frankly don't know how you could ever allege an

16   unjust enrichment claim here given that it's restitutionary

17   under California law.  So it just doesn't make sense to me in

18   this context.

19       But I fundamentally disagree with your theory.  I could be

20   wrong.  I understand that.  I'm just one person, one judge.

21   So, do you want to go straight to the Ninth Circuit?  If you

22   do, then I'll write it up.  And once you get the order, you

23   can appeal.  Or do you want to go back and work on your

24   complaint, and then maybe you convince me, maybe you haven't?

25   But after I see a revised complaint, knowing that I've got --

1    knowing some of the concerns I've already addressed, then I

2    can write something up.  If I still disagree with you, then

3    you can take it up to the Ninth Circuit.

4         How do you want to deal with this?

5         **MS. REYNOLDS:**  Your Honor, we are happy to amend.

6    Given your insight today, we would take the opportunity to

7    amend.

8         **THE COURT:**  I think you have to assume that it is

9    appropriate for the Court to take judicial notice of the

10   policy.  So that's what I'm -- I'm doing it here now.  I'm

11   going to do it again.  So you should consider that.

12        I really don't understand this unjust enrichment claim.

13   I'm one of the few judges, I think, that are out there that

14   will even let them go through.  Some judges just say, no, on a

15   stand-alone claim, dismissed.

16        But think again about that because, again, it just -- it

17   is a restitutionary claim so you have to have some kind of

18   connection between the two.  You have to have some theory of

19   how one can be -- how Stripe could be receiving a benefit

20   out -- in -- at the expense of the plaintiff.  I don't know.

21   It's just not logical to me.  There is the Restatement (Third)

22   of Restitution on Unjust Enrichment.  You can take a look at

23   that.  It's American Law Institute's product.

24        Okay.  And then one of the things that I do do with these

25   UCL claims, right, is I go through each of the various prongs.

1    So is it unlawful?  If it's unlawful, right, it has to be

2    tethered.  So an unlawful claim is going to rise and fall

3    probably with the 635 claim.  Just, again, so that you know,

4    the -- you have to have something that gives you a connection

5    to a statute.

6        In terms of unfair, then we go through the balancing test.

7    And if it's under the fraudulent claim, then you really do

8    need to have heightened allegations with respect to the

9    fraudulent allegations that you're claiming.

10        If you're only claiming omissions, then you have to have a

11    duty.  So those are some additional considerations.  I'm not

12    sure really which of the various prongs you are focused on.

13        How much time do you want to file an amended complaint?

14        MS. REYNOLDS:  Let me pull up my calendar, if you

15    don't mind.

16        I would say at least two weeks, but we would take three.

17        THE COURT:  Okay.  So let's say you will file your

18    amended complaint by May 11th.

19        Does that work?

20        MS. REYNOLDS:  Yes, Your Honor.

21        THE COURT:  Okay.  I am assuming I'm going to get a

22    renewed motion to dismiss, Mr. Blavin?

23        MR. BLAVIN:  That's what we anticipate, Your Honor.

24        THE COURT:  Okay.  Three weeks?

25        MR. BLAVIN:  Three weeks would be great.

1          **THE COURT:**  So that would be, you file that June 1st,

2     and then on a regular 35-day notice, the hearing will be

3     July 6.  Okay?

4          All right.  I think that's a plan.

5          All right?

6          **MS. REYNOLDS:**  Sounds good, Your Honor.  Do you want

7     to keep on calendar the CMC?

8          **THE COURT:**  No, let's take that off.  So the CMC is

9     vacated.

10          **MS. REYNOLDS:**  Thank you, Your Honor.

11          **THE COURT:**  And I do request that you send us, to the

12    chamber's proposed order mailbox, a redlined version of your

13    First Amended Complaint.  I just find it much easier to be

14    able to focus on the changes when you send it to us that way,

15    okay?

16          **MS. REYNOLDS:**  Yes, Your Honor.

17          **THE COURT:**  All right, everyone.  Have a good day.

18    Thank you.  We are adjourned.

19          **MR. BLAVIN:**  Thank you, Your Honor.

20          **THE COURT:**  Motion -- Ms. Stone, motion is granted

21    with leave to amend.  Thank you.

22          **MS. REYNOLDS:**  Thank you.

23          **MR. BLAVIN:**  Thank you.

24

25          (Proceedings concluded at 2:38 p.m.)

### CERTIFICATE OF REPORTER

I, Diane E. Skillman, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Diane E. Skillman*

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

Monday, April 26, 2021